STATE OF NEBRASKA, APPELLEE, V. ROY T. HUGHES, APPELLANT.
510 N.W.2d 33

Filed December 30, 1993.    No. S-92-1087.

Martin J. Kushner, of Kushner Law Office, for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and MORAN, D.J., Retired.

WHITE, J.

Roy T. Hughes appeals from jury verdicts finding him guilty of first degree murder and use of a firearm to commit a felony. Appellant, Hughes, was sentenced to life imprisonment on the murder conviction and 5 to 10 years' imprisonment on the firearm conviction. We reverse the judgment and remand the cause for a new trial.

Appellant alleges that the district court erred in (1) admitting into evidence an inculpatory out-of-court statement, (2) allowing the prosecution to improperly question a character witness, and (3) finding that sufficient evidence existed to support a guilty verdict. Our holding on appellant's first assignment of error is dispositive of the appeal, and our discussion therefore will be limited to those facts which are relevant to the admission of the out-of-court statement.

On August 30, 1991, Forrest Pointer was fatally shot. Prior to the shooting, at about 2:30 a.m. on August 30, Pointer had been in an altercation with appellant and three other individuals—Michael Floyd, Deandre Smith, and Nolan Berry—at the Tommie Rose Garden Apartments. Pointer waved a loaded shotgun at the four individuals, and Floyd later gave appellant a .22-caliber gun. Appellant testified that he fired the .22-caliber gun in the air and in the direction of Pointer to scare him away. An off-duty private security guard, who was present at the Tommie Rose Garden Apartments, made a 911 call regarding this altercation. According to the guard's testimony, while he was on the telephone with police, he heard gunshots and then watched Pointer leave the Tommie Rose Garden Apartments parking lot. Shortly after Pointer left the parking lot, the guard observed a white car and a red car appear to follow Pointer. The guard did not see who was in either of those two cars.

According to appellant, after Pointer left, Floyd said he knew where Pointer lived, and the four men decided to go looking for Pointer. Appellant testified that they never found Pointer and that they returned to the Tommie Rose Garden Apartments.

Smith's testimony was similar to appellant's. According to Smith, after Pointer left the Tommie Rose Garden Apartments, the four men got into a red car driven by Floyd and went to look for Pointer. Smith testified that he saw appellant with a .22-caliber pistol while they were in the car. Smith testified that they never found Pointer.

In contrast, Floyd testified that they found Pointer. According to Floyd, when they found Pointer, he was standing by the trunk of his car on Spaulding Street. Floyd stated that he

slowed down the car and that appellant reached under the seat, pulled out a gun, and shot Pointer. Floyd stated that Pointer was about 2 to 5 feet from their car when he was shot. Floyd testified that he did not know a gun was under the seat and did not know what had happened to the gun since the shooting. Floyd testified that after appellant fired the gun, the cylinder and bullets fell to the ground. Floyd stated that after the shot was fired, they drove back to the Tommie Rose Garden Apartments.

Pointer was found by his girl friend, Linda Bailey, in front of her house on Spaulding Street at about 5 a.m. on August 30. Pointer was brought by ambulance to St. Joseph Hospital, where he died later that afternoon. The pathologist who performed an autopsy on Pointer testified that Pointer died as the result of a gunshot wound to the head. The pathologist testified that because of the discoloration around the wound, the shot must have been fired while the gun was within inches of, if not actually in contact with, Pointer's head. The pathologist testified that the wound was probably caused by a .38-caliber bullet; however, the pathologist did not conduct any specific tests to determine the actual size of the bullet removed from Pointer's head. At the scene of the shooting, police recovered one spent .38-caliber round, five live .38-caliber rounds, and a six-shot cylinder for a .38-caliber revolver.

Appellant's first assignment of error concerns the admissibility of an out-of-court statement made by Berry. Specifically, appellant contends that the statement did not fall within the hearsay exception for statements against penal interests and that its use violated his confrontation and due process rights under the U.S. and Nebraska Constitutions.

Berry did not testify at trial because he asserted his Fifth Amendment right against self-incrimination. Over defense counsel's timely objections, the trial court ruled that because of Berry's assertion, he was exempt from testifying and, therefore, unavailable within the meaning of Neb. Rev. Stat. § 27-804(1)(a) (Reissue 1989). The court permitted the prosecution to admit into evidence an out-of-court statement made by Berry on September 5, 1991. The court found that the statement fell within the hearsay exception regarding

statements against penal interests. The following constitutes a recitation of the facts surrounding the three statements.

On September 4, 1991, at about 11:51 p.m., police brought Berry to the police station so they could interrogate him regarding the Pointer shooting. The officer who interrogated Berry stated that he read Berry his *Miranda* rights and that Berry signed a waiver of rights form. The officer testified that he talked with Berry for about 2 hours before he began tape recording Berry's statement. The officer further testified that during this 2-hour period, he told Berry that he, Berry, must have been the shooter. The officer stated that he said this to Berry because the officer wanted to scare Berry into making a statement. When the tape recorder was finally turned on, Berry made a statement in response to the officer's specific questions. The interrogation ended at 2:13 a.m. on September 5.

According to Berry's tape-recorded statement, the four men went to find Pointer after the first altercation. Berry stated that they found Pointer and that appellant shot Pointer from the front seat of a red car driven by Floyd. Berry stated that appellant fired several shots at Pointer and that Pointer was a few feet from the car when he was shot. Berry stated that he did not know where the gun came from or what had happened to it since the shooting.

On March 13, 1992, Berry returned to the police station and made a second statement. In this second statement, Berry told police that he had lied in his first statement because the police officers had told him that he, Berry, would be charged with the murder if he did not name somebody else for the crime. In this second statement, Berry also said that he witnessed part of the first altercation with Pointer, but that he did not go with Floyd, Smith, and appellant to find Pointer. Berry stated that he did not witness the shooting and did not know whether appellant had shot Pointer.

On August 13, Berry made a third statement. This third statement was made at the offices of appellant's attorney. Berry gave this sworn statement in the presence of his mother, appellant's attorney, a court reporter, two private detectives, and a paralegal. In his third statement, Berry reiterated what he had told police in his second statement. According to Berry, he

had lied during his first statement because he feared that the police would charge him with the murder. Berry claimed that he was not with Floyd, Smith, and appellant when they allegedly went after Pointer and that he did not see anybody shoot Pointer. The second and third statements were entered into evidence solely for the purpose of counteracting the court's decision to overrule appellant's objection to the admission of the first statement.

" '[I]n all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence . . . .' " *State v. Thompson, ante* p. 375, 394, 507 N.W.2d 253, 267 (1993). Accord, *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993). See, also, *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993) (stating that the admissibility of hearsay evidence pursuant to an exception to the hearsay rule was no longer a matter within the discretion of the trial court); *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991). " 'In a jury trial of a criminal case, whether an error in admitting or excluding evidence reaches a constitutional dimension or not, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.' " *Toney*, 243 Neb. at 244, 498 N.W.2d at 550 (quoting *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989)).

The State contends that Berry's statement falls within the hearsay exception for statements made against the declarant's penal interests. Section 27-804 provides that an out-of-court statement will not be excluded by the hearsay rule if (1) the out-of-court declarant is unavailable and (2) the statement is so contrary to the declarant's penal interests that a reasonable person in a similar position would not have made the statement unless he believed it to be true. § 27-804(1) and (2)(c); Proposed Neb. Evid. R. 804 (Tentative Draft 1973) (stating that the Nebraska rule is identical to Fed. R. Evid. 804 regarding statements against penal interests). For purposes of our analysis, we assume, first, that the declarant was unavailable to

testify because he invoked his Fifth Amendment right against self-incrimination, and second, that the statement was against his penal interests because it tended to subject him to criminal liability.

A third element must be satisfied if the statement implicates a *defendant's* penal interests as well as the *declarant's* penal interests. This third element requires the court to examine the totality of the circumstances surrounding the making of the statement to determine whether they indicate that the statement is trustworthy. This third element is designed to satisfy the defendant's confrontation rights. See, *U.S. v. Boyce*, 849 F.2d 833 (3d Cir. 1988); *United States v. Rasmussen*, 790 F.2d 55 (8th Cir. 1986).

The Confrontation Clause of the Sixth Amendment and art. I, § 11, of the Nebraska Constitution secure a defendant's right to confront and cross-examine witnesses brought against him. See *Dutton v. Evans*, 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) (applying the 6th Amendment to the states through the 14th Amendment). The purpose of cross-examination is to ensure that the trier of fact has a sufficient basis to assess the truthfulness of the evidence. *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986); *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *State v. Warford*, 223 Neb. 368, 389 N.W.2d 575 (1986); *State v. Roy*, 214 Neb. 204, 333 N.W.2d 398 (1983). The Confrontation Clause should be abrogated only when the evidence is sufficiently reliable and trustworthy that it obviates the need to explore the state of mind of the declarant. *White v. Illinois*, _____ U.S. _____, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992); *Roberts, supra; Roy, supra.*

The U.S. Supreme Court recognized the difficulty in merging the Confrontation Clause and the hearsay rules:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of

particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66. The analysis therefore requires a determination of whether the statement falls within a firmly rooted hearsay exception, and if it does not, then a determination of whether the statement has particularized guarantees of trustworthiness. Firmly rooted exceptions are presumptively reliable and trustworthy; therefore, inferring reliability of hearsay statements which fall within such an exception will not violate a defendant's confrontation rights. *Roberts, supra*; *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993). However, the hearsay exception for statements made against the declarant's penal interests "defines too large a class for meaningful Confrontation Clause analysis." *Lee*, 476 U.S. at 544 n.5. See, also, *Flores, supra*.

Although the hearsay exception for statements against penal interests encompasses statements that may be inherently reliable, the exception also encompasses statements that are inherently unreliable. Particularly, statements made while the declarant is in police custody and in which the declarant implicates another party are highly suspect and presumptively unreliable. *Lee*, 476 U.S. at 541 (stating that "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination"). Generally, the circumstances surrounding the making of these statements necessitate an exploration of the declarant's state of mind. It cannot be said, without a specific showing of trustworthiness, that such a statement should be admitted without an opportunity for cross-examination. See, *Lee, supra*; *Olson v. Green*, 668 F.2d 421 (8th Cir. 1982), *cert. denied* 456 U.S. 1009, 102 S. Ct. 2303, 73 L. Ed. 2d 1305.

Unlike other exceptions to the hearsay rule, statements made in response to police interrogation generally do not have inherent guarantees of reliability and trustworthiness. For example, the spontaneity of an excited utterance reduces the risk of inaccuracies because the statement is not the result of a declarant's conscious effort to make a statement. See *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990).

On the other hand, a statement made by a person subject to criminal liability, in which the declarant incriminates a third party, may be the result of the declarant's motivation and opportunity to curry favor with the authorities. *Lee, supra*; *Olson, supra*; *United States v. Riley*, 657 F.2d 1377 (8th Cir. 1981); *United States v. Love*, 592 F.2d 1022 (8th Cir. 1979); Proposed Neb. Evid. R. 804 notes (Tentative Draft 1973); Fed. R. Evid. 804, Notes of Advisory Committee on 1972 Proposed Rules. Thus, we hold that reliability of statements that fall within the hearsay exception for statements against penal interests may not be inferred, and the proponent of such evidence must carry the burden of demonstrating the trustworthiness and reliability of the statement. See, *Flores, supra*; *United States v. Rasmussen*, 790 F.2d 55 (8th Cir. 1986) (adding a third element to the analysis for statements against penal interests, which element requires a finding of trustworthiness for statements wherein the declarant implicates the accused, is intended to satisfy the accused's confrontation rights); *Olson, supra*; *State v. Palser*, 238 Neb. 193, 469 N.W.2d 753 (1991) (declining to infer reliability even though the statement fell within the exception for statements against penal interests).

To determine whether a statement against penal interests has particularized guarantees of trustworthiness, a court must examine the totality of the circumstances surrounding the making of the statement. *Wright, supra*; *U.S. v. Boyce*, 849 F.2d 833 (3d Cir. 1988); *Rasmussen, supra*; *Palser, supra*. Particularly relevant to the determination of trustworthiness is whether the declarant was in police custody when the statement was made, whether the declarant had a motive to mitigate his own criminal liability, and whether the declarant made the statement in response to leading questions. See, *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986); *Boyce, supra*; *Palser, supra*. These factors are similar to the factors this court has found relevant when considering whether a hearsay statement is sufficiently trustworthy to satisfy the residual exception to the hearsay rule. See *State v. Toney*, 243 Neb. 237, 245-46, 498 N.W.2d 544, 551 (1993) (stating that for purposes of the residual exception, a court should examine "whether the

statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement").

When a court examines the totality of the circumstances, it must keep in mind that evidence tending to corroborate the content of a hearsay statement cannot "support a finding that the statement bears 'particularized guarantees of trustworthiness.' " *Wright*, 497 U.S. at 822. Accord *U.S. v. Flores*, 985 F.2d 770 (5th Cir. 1993). The hearsay evidence "must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence . . . ." *Wright*, 497 U.S. at 822. If the circumstances indicate a likelihood that the declarant had a motive to lie, there is a greater need to cross-examine the declarant, and corroborating evidence is not a substitute for that need to explore the declarant's motivation. *Wright, supra* (limiting and explaining the Court's decision in *Lee, supra*, regarding the factual similarity between the hearsay statement and the defendant's statement to determine whether the admission of the hearsay violated defendant's confrontation rights); *Flores, supra*.

This court has addressed in *Palser, supra*, the issue of whether an out-of-court statement contained sufficient indicia of trustworthiness to satisfy the Confrontation Clause. In *Palser*, the defendant was charged with distributing a controlled substance which he allegedly sold to the out-of-court declarant. The trial court permitted the State to admit into evidence a statement that the declarant had made to the police in which he said that he obtained the drugs from the defendant. This court declined to infer the reliability of the out-of-court statement and maintained that the statement must possess " 'particularized guarantees of reliability' " to satisfy the defendant's confrontation rights. *Palser*, 238 Neb. at 201, 469 N.W.2d at 758.

In determining that the statement in *Palser* possessed particularized guarantees of trustworthiness, this court examined the totality of the circumstances surrounding the making of the statement. Specifically, the court found that the declarant voluntarily went to the police, that the declarant was never in police custody or under arrest, that the police informed the declarant of the evidence they had against him concerning his role in the alleged drug sale, that the police informed the declarant of the criminal charges he could receive for that role, that the police told declarant he could serve as a cooperating witness or be charged for his role in the sale, that the declarant elected to be a cooperating witness and signed a cooperating witness agreement, and that the declarant wrote out his statement wherein he admitted his role in the sale. In finding that the statement was particularly trustworthy, the court reasoned that the declarant's motive to mitigate his criminal liability was absent.

In *U.S. v. Boyce*, 849 F.2d 833 (3d Cir. 1988), the district court admitted the out-of-court statement as a hearsay exception for statements against the declarant's penal interests. The declarant made the statement while he was in police custody and without the benefit of counsel. The police had advised the declarant of his *Miranda* rights before he wrote his statement. In the statement, the declarant wrote that he and two other individuals broke into a jewelry store and stole a large quantity of jewelry. The statement then described how the three left the store and that they fenced the goods. On appeal, the court of appeals held that the admission of the statement against the appellant was prejudicial error. The court of appeals stated that it could not find any evidence in the record that would negate the declarant's motivation to lie. Moreover, the court noted, after the declarant made the statement, he entered into a favorable plea bargain with prosecutors.

In the present case, the declarant's motive to fabricate has not been eliminated. When Berry made his first statement, he was in police custody. The police had picked up Berry and brought him to the police station to be interrogated regarding the Pointer shooting. Prior to questioning, the police read Berry his *Miranda* rights and Berry signed a waiver form. The

officer who interrogated Berry testified that he told Berry that Berry must be the shooter. The officer testified that he did this to scare Berry into talking. According to the officer, this conversation with Berry was not tape-recorded. The officer testified that he did not turn on the recorder until he had spent about 2 hours with Berry. The tape-recorded statement which was played for the jury involved Berry's response to direct police questioning.

A statement made to police by an alleged accomplice which incriminates another person is presumptively unreliable. The similarities between the statement and other evidence regarding the offense are irrelevant to whether the statement possesses particularized guarantees of trustworthiness. Unlike in *Palser*, the declarant here was in police custody when he made the statement, and the officer who interrogated Berry repeatedly told Berry that he "must be the shooter." Berry was not given a choice of admitting his crimes and becoming a cooperating witness; rather, he was in a position to deny the officer's accusations that he was the shooter. Berry had a motive to make a statement which identified another person as the shooter and thus relieve himself of that liability. This motive to fabricate can be explored only by a meaningful opportunity to cross-examine the witness at trial. Berry's statement was oral and was substantially in the form of answers to direct questions posed by the interrogating police officer. Additionally, Berry has recanted his first statement at least twice since September 5, 1991.

There is not enough indication of reliability and trustworthiness to obviate the need for cross-examination of the declarant. See, *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986); *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). The State has not demonstrated sufficient evidence regarding the circumstances surrounding the making of the statement to overcome the presumption of unreliability. We therefore find that the trial court erred in admitting the statement into evidence.

An erroneous admission of evidence is considered prejudicial to a criminal defendant unless the State demonstrates that the

error was harmless beyond a reasonable doubt. *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993); *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989). An error is harmless when the improper admission did not materially influence the jury to reach a verdict adverse to the substantial rights of the defendant. *Id.* After a review of the entire record, we cannot say that the State has proven beyond a reasonable doubt that the admission of Berry's statement was harmless. Appellant attempted to mitigate the effect of the admission of the first statement by introducing into evidence the two other statements made by Berry. We cannot say that appellant's use of the other statements diminished the harm caused by the erroneous admission of the first statement, and appellant's use of those statements solely for the purpose of counteracting the court's error does not constitute a waiver of appellant's confrontational rights. Cf. *State v. Bromwich*, 213 Neb. 827, 331 N.W.2d 537 (1983).

Because we direct that the convictions be reversed and the cause remanded for a new trial, we do not address the other assignments of error raised by appellant.

REVERSED AND REMANDED FOR A NEW TRIAL.